UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:_____-Civ-

|  |  |  |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | Hon._____ |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TIMOTHY JOSEPH ATKINSON, JAY PASSERINO, ALL IN PUBLISHING, LLC, & GASHER, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF AND PENALTIES
UNDER THE COMMODITY EXCHANGE ACT**

The Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

through its attorneys, hereby alleges as follows:

## I.   SUMMARY

1.      Beginning in at least October 2013 through at least November 2016

("Relevant Period"), Timothy Atkinson, Jay Passerino, All in Publishing, LLC, and Gasher,

Inc. (collectively, "Defendants"), acting as affiliate marketers and as commodity trading

advisors ("CTAs"), conducted at least twenty-nine (29) fraudulent binary options affiliate

marketing campaigns in which they fraudulently solicited tens of millions of prospective

customers to open and fund illegal, off-exchange binary options trading accounts ("binary

options account(s)") through websites operated by unregistered binary options brokers

("Broker(s)").

2.      As affiliate marketers and CTAs, Defendants disseminated–and recruited other affiliate marketers to disseminate on their behalf–fraudulent marketing campaigns which advised unsuspecting prospective customers to open and fund binary options accounts with Brokers to get free access to Defendants' automated trading software that purported to generate astronomical profits with no risk of loss.  Defendants'  marketing materials included numerous false and misleading statements about the advertised trading software, including: (i) fictitious trading performance and account statements showing consistent profits with no losses; (ii) actors depicted as true users and/or creators of the binary options automated trading software falsely claiming they had earned significant profits through use of the software; and/or (iii) false representations of actual live automated binary options trading and results using the advertised software.

3.      During the Relevant Period, millions of prospective customers viewed fraudulent marketing websites and sales videos that Defendants created and/or disseminated which advised customers to open binary options accounts with purported "recommended" Brokers and use Defendants' automated trading software.  In response to this marketing, at least 51,000 customers deposited at least $12,750,000 to initially fund their accounts.

4.      Defendants received a flat commission from a Broker, customarily between approximately $350 and $450, for every customer that viewed one of their online campaigns and opened and funded a binary options account with a Broker as a result.  During the Relevant Period, Defendants received over $27 million related to binary options affiliate marketing.   Defendants also earned commission from disseminating thousands of

solicitations that included material false or misleading statements and information that other affiliate marketers created.

5.      Defendants intentionally or recklessly included materially false or misleading statements and information in the marketing materials they sent out to prospective customers and customers.

6.      By virtue of this conduct and further conduct described below, Defendants have engaged, are engaging, or are about to engage, in acts and practices in violation of the following sections of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and accompanying regulations ("Regulation(s)"), 17 C.F.R. Pts. 1-190 (2018):

a.      Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.4, 17 C.F.R. § 32.4 (2018), which prohibit fraud in connection with commodity options transactions;

b.      Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2012), which prohibits fraud by, among others, a CTA;

c.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), (2018), which prohibit deceptive devices, schemes and/or artifices in connection with, among other things, swap transactions and prohibit false statements;

d.      Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2018), which prohibits fraud in advertising by, among others, a CTA or any principal thereof, and also mandates that certain disclosures appear prominently with any testimonials; and

e.      Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2018), which mandates that certain

disclosures appear prominently and in immediate proximity to any advertised

hypothetical or simulated trading results or performance.

7.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the

Commission brings this action to enjoin Defendants' unlawful acts and practices and to

compel Defendants' compliance with the Act and Regulations, and to further enjoin

Defendants from engaging in certain commodity options and swaps-related activities.

8.      In addition, the Commission seeks civil monetary penalties and remedial

ancillary relief, including, but not limited to, trading and registration bans, restitution,

disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court

may deem necessary and appropriate.

9.      Unless restrained and enjoined by this Court,  Defendants are likely to

continue to engage in the acts and practices alleged in this Complaint and similar acts and

practices, as more fully described below.

## II.      JURISDICTION & VENUE

10.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012)

(federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2012),

authorizes the Commission to seek injunctive relief against any person whenever it shall appear

that such person has engaged, is engaging, or is about to engage in any act or practice that violates

any provision of the Act or any rule, regulation, or order promulgated thereunder.

11.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because  Defendants are found in, inhabit, or transact business in the Southern District of Florida, and the acts and practices in violation of the Act and Regulations have occurred within this District, among other places.

### III.     THE PARTIES

12.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and regulations promulgated thereunder.

13.     Defendant **All In Publishing, LLC** ("AIP") was established as an Arizona limited liability company in 2012.  On or about February 19, 2014, AIP became a Florida limited liability company with its principal place of business in Miami, Florida.  At all times relevant, Defendant Timothy Atkinson has been the owner, member, and president of AIP. AIP has never been registered with the Commission in any capacity.

14.     Defendant **Timothy Joseph Atkinson** ("Atkinson") is an individual who resides in Miami, Florida.  During the Relevant Period, Atkinson was the sole owner and president of AIP.  Atkinson was also a signatory to and controlled AIP's bank accounts, and otherwise controlled and supervised all AIP business.  Atkinson has never been registered with the Commission in any capacity.

15.     Defendant **Jay Passerino** ("Passerino") is an individual who resides in Miami, Florida.  From January 2014 through approximately October 2016, Passerino controlled and oversaw the day-to-day operations of AIP, represented himself to others as the Vice President of AIP, and shared in profits of the company for his services.  During the

Relevant Period, Passerino was also a signatory to AIP's bank accounts and conducted AIP business in his own name and also in the name of an entity that he owned called Gasher, Inc. Passerino has never been registered with the Commission in any capacity.

16.     Defendant **Gasher, Inc**. ("Gasher") was incorporated as a Florida Corporation in 2013.  During the Relevant Period, Gasher's principal place of business was in Miami, Florida and Passerino owned Gasher and served as its president.  During part of the Relevant Period, i.e., between at least January 2014 and approximately October 2016, Gasher provided services to AIP for consulting and also received payments from AIP for Passerino's operation of AIP business.  Passerino conducted AIP business in his own name and in the name of Gasher up until the time that Gasher and Passerino severed their relationship with AIP around October 2016.  AIP, through Atkinson, used "gasherinc" as a username when engaging in binary options affiliate marketing activities.  Gasher has never been registered with the Commission in any capacity.

## IV.     OTHER RELEVANT PARTIES

17.     **Partner** is an Israeli company with its principal place of business in Tel Aviv and two Israeli individuals who own the company and conduct its various business activities related to binary options.  Partner has never been registered by the Commission in any capacity.

18.     Partner worked with Defendants on Defendants' binary options marketing campaigns and made payments to Defendants related to those activities.  For example, Partner supplied and/or procured the trading software advertised in Defendants' campaigns and which customers used to trade their accounts.  Partner also selected Brokers for

Defendants' campaigns and controlled the webpages on Defendants' campaign websites which directed customers to various Brokers.  By controlling those links, Partner was the actual, but undisclosed, intermediary which directed customers to various binary options Brokers.

## V.     STATUTORY BACKGROUND AND FACTS

### A.     Prohibition Against Off-Exchange Retail Swaps and Options Trading

19.     Section 1a(12)(A) of the Act, 7 U.S.C. § 1a(12)(A) (2012), defines "commodity trading advisor" as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or advisability of trading in" any commodity for future delivery, security futures product, swap, and/or commodity option.

20.     Section 2(e) of the Act, 7 U.S.C. § 2(e) (2012), makes it unlawful for "any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 5 [7 U.S.C. § 7]."

21.     7 U.S.C. § 1a(47)(A) defines "swap" to include, among other things, any agreement, contract, or transaction that: (a) is an option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, without also conveying an ownership interest in any asset or liability.

22.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

23.     Regulation 32.2, 17 C.F.R. § 32.2 (2018), makes it unlawful for any person to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any swap.

24.     None of the Brokers to which Defendants, through Partner, directed their web traffic from their campaigns was registered with the Commission in any capacity.

**B.      Overview of Defendants' Scam: Affiliate Marketing in Binary Options**

25.     This case involves affiliate marketing involving binary options transactions. A binary option is a type of option contract in which the payout depends entirely on the outcome of a discrete event – usually a "yes/no" proposition.  The yes/no proposition typically relates to whether the price of a particular asset will rise above or fall below a specified amount at a specified date and time.  For example, the yes/no proposition might be whether the price of silver will be higher than $33.40 per ounce at 11:17 am on a particular

day, or if the exchange rate between the US Dollar and the Euro will be above $1.18 at 2:15 pm on a given day.

26.     Once the option holder acquires a binary option through payment of a premium, there is no further decision for the holder to make as to whether or not to exercise the binary option because binary options exercise automatically.  Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled."  When the binary option expires, the option holder is entitled to a pre-determined amount of money if the customer has made a correct prediction. If the customer has made an incorrect prediction, he or she gets nothing and loses the entire premium paid.

i.     <u>Binary Options Affiliate Marketing</u>

27.     There are various players participating in binary options schemes.  They include affiliate marketers, Broker intermediaries, Brokers and the trading platforms. Customers open trading accounts with Brokers and deposit funds into those accounts through Brokers.  Affiliate marketers either work directly with Brokers or they use Broker intermediaries to direct prospective customers and customers from their marketing campaigns to the Broker website.

28.     This case primarily involves affiliate marketers.  Affiliate marketers initiate the binary options fraudulent scheme by creating and disseminating solicitations that include material false or misleading statements to induce prospective customers to open an account and trade binary options through a Broker.

29.     Affiliate marketing is a form of performance-based marketing that is predominantly conducted via email solicitations and promotional materials made available on internet websites.  An affiliate marketing campaign is a promotion of a product/service designed to convince the audience to take a specific action, including purchasing a product or service or opening and funding a trading account.  Affiliate marketing is referred to as a campaign or funnel because the advertising is designed to funnel (i.e. drive) customers to the service provider or product owner.  Affiliate marketing occurs in various business segments, including Internet Marketing ("IM"), Business Opportunities ("BizOp"), Foreign Exchange ("Forex"), Binary Options, and, more recently, Virtual Currencies.

30.     Affiliate marketers in binary options either act as Affiliates or sub-affiliates. Affiliates interface with Brokers or Broker intermediaries and are generally responsible for creating marketing materials.  Affiliates generally come up with a marketing angle, write or procure a script with fictional characters and trading results, and then produce (or retain someone to produce) sales videos based on those scripts which advise prospective customers to use binary options "software" or "automated tools" that purportedly activate upon funding a trading account with a specified Broker.  Affiliates also generally create solicitation communications that include materially false or misleading information disseminated through email to lead lists.  At times, Affiliates use solicitation materials created by others that they "partner" with for specific binary options campaigns.

31.     Affiliates may also act as recruiters for the binary options advertising campaign by soliciting other sub-affiliates to send out the Affiliates' marketing or solicitation materials to the sub-affiliates' lead lists.  Affiliates also disseminate marketing materials for

their own campaigns to their lead lists.  Affiliate marketers' and sub-affiliates' lead lists can range from thousands to millions of email addresses.

32.     Binary options affiliate marketers depended upon each other to "support" their campaigns to reach as many prospective customers as possible and thus increase the likelihood of converting the leads to new trading accounts.  To avoid stepping on toes and saturating the market, Affiliates established systems whereby they each signed up for dates to launch their campaigns.  While not all Affiliates followed the "calendar", failing to abide by its schedule could result in less (or no) support from sub-affiliates.  Affiliates skirted the "rules" by establishing strategic partnerships with other Affiliates who managed the front-end of a marketing campaign by recruiting sub-affiliates and identifying the campaign as their own in exchange for sharing in the profits of the campaign.

33.     The solicitation communications used by Affiliates and sub-affiliates include an embedded link to a campaign website that is usually prepared by Affiliates (or their partners).  The first landing page for the campaign–i.e., where the link in the email is directed–generally includes streaming sales video and an "opt-in" where a potential customer enters his or her name and email to get access to the full sales video and/or for more information.  Affiliates mine that data to add to their "lead lists" for future campaigns. Campaigns with multiple web pages usually include additional opportunities for a customer to further opt-in by providing additional personal data to open a trading account with the designated Broker; that page may also have a second video.  Affiliates and call centers established by the Broker follow up via email or telephone calls with prospective customers who fail to open or fund an account or who have questions before doing so.

34.     In this matter, Defendants did not work directly with any Brokers and instead relied on Partner to serve as their Broker intermediary.  Broker intermediaries maintain direct relationships with various Brokers and select which ones to use for each campaign.  Broker intermediaries generally use multiple Brokers for each campaign and obtain commission payments directly from Brokers for each customer that opens and funds a trading account for the first time (known in the industry as a first time depositor, ("FTD").  Brokers pay a flat commission for each FTD that deposits a minimum threshold (generally $250), regardless of the customer's subsequent trading results or deposits.  Broker intermediaries also pay the Affiliates with whom they work a portion of the commission that they receive from Brokers; Affiliates generally earn between $250 to $450 in commission per FTD.  Affiliates then determine the sub-set of their commission that they pay-out to sub-affiliates.

ii.   Defendants' Roles as Affiliates & Sub-Affiliates

35.     During the Relevant Period,  Defendants and Partner worked together to launch fraudulent binary options campaigns as Affiliates.   Defendants also acted as sub-affiliates in connection with Partner.

36.     During the Relevant Period,  Defendants disseminated fraudulent solicitations and earned commissions from at least twenty-nine (29) fraudulent binary options advertising campaigns as Affiliates and/or sub-affiliates: (1) Automated Income App (late 2013/early 2014); (2) Autobitcoin Cash (February 2014); (3) Binary Pilot (~February 2014); (4) Golden Goose Method ("GG") (January 2014-March 2014); (5) Push Button Millionaire (February 2014-September 2015); (6) Daily Binary Profit/Binary Profits Daily (March 2014); (7) Rock Star Commissions (March 2014); (8) Income Rush (March 2014); (9) Profit Partners (March

2014); (10) Easy Profits (March 2014); (11) Auto Money App ("AMA") (June 2014-July 2015); (12) Cash Code ("CC") (June 2014-April 2016); (13) Free Money System ("FMS") (June 2014); (14) Free Money App (June 2014-June 2015); (15) Quick Cash System (June 2014-May 2016); (16) Easy Money Machines (June 2014-June 2015); (17) Free Cash (July 2014-October 2015); (18) Secret Millionaire Society (October 2014-June 2015); (19) Cash Software (October 2014-December 2014); (20) Money Platform (January 2015); (21) Push Button Commissions (January 2015-April 2015); (22) Copy Op (February 2015-May 2015); (23) Copy Trade Profit (April 2015); (24) Binary Cash Creator ("BCC") (May 2015-March 2015); (25) Free Millionaire System (May 2015); (26) Easy Money Method (May 2015); (27) Fast Cash (October 2015-June 2016); (28) Push Money App ("PMA") (June 2016-October 2016); and (29) Click Money System ("CMS") (October 2016).

37.     Of those campaigns,  Defendants acted as Affiliates for at least twenty (20), including: (1) Automated Income App ; (2) GG; (3) Push Button Millionaire; (4) Rock Star Commissions ; (5) AMA; (6) CC; (7) FMS; (8) Free Money App; (9) Quick Cash System ; (10) Easy Money Machines; (11) Free Cash; (12) Secret Millionaire Society; (13) Cash Software; (14) Push Button Commissions; (15) Binary Cash Creator; (16) Free Millionaire System; (17) Easy Money Method; (18) Fast Cash (October 2015-June 2016); (19) PMA; and (20) CMS.

38.     Defendants' campaigns marketed trading software, systems, and applications ("Trading System(s)") which purported to successfully trade automatically or provide profitable trading recommendations in binary options related to commodity futures, swaps, foreign exchange currency pairings, rates, indices, securities, and/or other assets.

13

39.     As Affiliates, Defendants lured customers in their marketing campaigns by promising free access to their advertised Trading Systems.  Their marketing materials included campaign websites, emails, and sales videos.  Defendants' goal was to earn commissions by inducing prospective customers to open and fund binary options trading accounts.

40.     Some solicitation materials explicitly referenced the underlying asset for binary options as commodity futures, currency pairings, and/or swaps.  Other campaigns depicted screenshots showing those assets as available to trade and/or as having been traded using the marketed Trading Systems.

41.     For each of the twenty-nine campaigns for which Defendants acted as Affiliates and/or sub-affiliates, Defendants sent bulk email solicitations designed to entice the recipients to click an embedded electronic link in the email that routed the user to the related binary options campaign websites ("website).  Each website, in turn, included a streaming VSL created or procured by Defendants, their partners, or other Affiliates.

42.     When acting as an Affiliate for at least twenty campaigns, Defendants generated websites that served as the vehicles through which Defendants carried out their binary options campaigns.

43.     Defendants paid for and registered the domain names associated with Defendants' campaign websites, which generally included some variation of the campaign name like http://automoneyapp.com for AMA, or http://fastcash.biz for Fast Cash.

44.     Passerino (and/or AIP employees or independent contractors that Passerino oversaw) had primary responsibility for registering Defendants' campaign website domains,

14

setting up the hosting, uploading Defendants' content, and managing the technical aspects of the campaign. Atkinson also usually tested the functionality of the campaign websites.

45.     Passerino and an AIP employee/independent contractor that he oversaw also communicated with Partner concerning technical issues related to the campaign websites and responding to customer complaints.

46.     Defendants' campaign websites generally contained multiple webpages, including a landing page, members' page, and registration page. Prospective customers arrived at Defendants' landing page(s) of their websites by clicking on a link embedded in an unsolicited email ("spam") or internet advertisement. Defendants' landing pages typically consisted of a single webpage with a streaming VSL, along with a field for the customer to enter a name and email address to get more information and/or open and fund an account to gain access to the marketed Trading System. AIP Defendants mined that data to add to their lead lists for future spamming.

47.     Defendants' members' pages often included another VSL and forms to register and/or open a binary options account. Prospective customers could usually fund their new account through the third registration webpage, which was also registered and hosted by AIP Defendants, but controlled by Partner and/or the selected Brokers.

48.     Partner had direct relationships with Brokers, selected which ones to use for each of Defendants' campaigns, tracked progress with each Broker, and managed those relationships. Partner used multiple Brokers for each of Defendants' campaigns.

49.     Partner worked with the Brokers to make sure that the Brokers' sales representatives were ready to "convert" prospective customers directed to them through

Defendants' campaigns who had not already opened and funded a trading account. Defendants knew that Brokers used their fraudulent marketing materials to re-solicit and follow up with those prospective customers via email and sales calls.  In fact, before Defendants launched a campaign, Partner disseminated links to the campaign website to the Brokers with instructions for them to watch the VSL and try out the Trading System "so they'll know how to attack it and get the right bullets."

50.     Atkinson (individually and on behalf of Defendants) created and/or procured approximately twenty of the VSLs streamed on the campaign websites and otherwise used sales videos provided by Partner.  AIP, through Atkinson, Passerino, and others, intentionally or recklessly included materially false or misleading statements in VSLs used in Defendants' marketing campaigns.

51.     Defendants' solicitation emails and corresponding campaign websites contained numerous false or misleading statements about the marketed Trading Systems' performance, results, and risk of loss.  Defendants intentionally or recklessly disseminated these false or misleading statements. Atkinson even bragged to Affiliates about what he called his "scams".

52.     Defendants, directly or indirectly, sent tens of millions of emails fraudulently soliciting binary options accounts during the Relevant Period for the twenty campaigns that they launched.

53.     Defendants, primarily by Passerino, also sent thousands of solicitation emails when acting as sub-affiliates for binary options campaigns.

54.     Defendants received a pre-determined, flat commission (generally between $350-$450) from a Broker for each FTD resulting from their solicitation efforts.  The Brokers that Defendants ran campaigns for generally required a customer to deposit at least $250 to open a trading account and qualify as an FTD.

55.     Defendants relied on sub-affiliates and individuals in the industry that purchased advertisement banners or other forms of "media" to help drive prospective customers to their fraudulent campaign websites.

56.     Defendants often ran contests with prizes for their launches to encourage sub-affiliates and media buyers to promote their campaigns more aggressively.  Defendants regularly paid thousands of dollars as prizes in these contests and in at least one instance awarded a Rolex to the winner.

57.     Following receipt of their commissions, Defendants paid-out to sub-affiliates a portion of the total commissions for FTDs opened from the sub-affiliates' efforts. Defendants retained their own commissions in addition to the difference between the total commission and the portion paid-out to sub-affiliates as the "advertiser profits" for each of their campaigns.  Defendants and Partner shared in the advertiser profits for their campaigns.

58.     When acting as sub-affiliates for other Affiliates' campaigns, Defendants frequently earned prizes based on their performance, including thousands of dollars in cash and/or in kind rewards.

59.     In addition to commissions and advertiser profits, Defendants' campaigns generated the personal information of prospective customers and/or customers from their

launches.  Defendants mined that data to use in future campaigns and/or sold it to other affiliate marketers.

60.     Defendants intentionally or recklessly disregarded that the stories, characters, trading performance results, and testimonials included in the marketing materials they created and/or prepared by Partner were fictitious.  Defendants intentionally or recklessly published this false or misleading information in VSLs as part of their marketing campaigns on the internet.

61.     Defendants knew or were reckless in not knowing that the materials they disseminated as sub-affiliates were false and misleading.  Atkinson even joked with other affiliate marketers about mailing out their fraudulent solicitations knowing they were scams, targeting the elderly, doing a fundraiser for the customers to "put them back on track" to scam them again, among other things.

62.     Defendants' marketing materials failed to include the required 17 C.F.R. § 4.41 disclosures.

**C.     Defendants' Fraudulent Email Solicitations**

63.     Passerino had responsibility for sending out bulk spam emails for campaigns to prospective customers on behalf of Defendants.  Passerino did so for the fraudulent campaigns Defendants launched and also when Defendants acted as a sub-affiliate for fraudulent binary options campaigns launched by others.

64.     Atkinson directed Passerino to manage the spamming part of AIP business (and operations in general) and oversaw those activities.  Passerino bragged to other affiliates about his role at AIP: "Tim doesn't pay me, I pay him . . . latr!!!!!crooksssss".

18

65.     Defendants' mass emails contained numerous false or misleading statements about the advertised Trading Systems, e.g., that customers can and have already "made millions" trading with the Trading Systems, or that customers made hundreds in profits in seconds, thousands in a day, and became millionaires in a few months.  The emails often created the appearance of urgency by stressing that "spots are limited" or "time is running out."

66.     Defendants wrote or hired professionals to write short targeted emails ("swipes") for Defendants' campaigns, primarily to use as follow-ups with prospective customers who didn't take the bait with just the initial solicitation.  Defendants used that content to spam prospective customers on their lead lists.  Defendants also made the swipes available to sub-affiliates for them to use while promoting Defendants' campaigns.

67.     For example, in or about June 2014, Atkinson retained the services of a copywriter to generate swipes for the FMS campaign.  Atkinson explained to the copywriter: "We want hypey spam emails . . . Please review these swipes http://easymoneymachines.com/juv/ [(from a prior Defendants binary options campaign).] Try to create subject lines that trick people to open the emails ..[.] Then short, precise swipes to get them to click thru.  That is our goal."

68.     Defendants created and/or procured similarly deceptive swipes for each of its campaigns.  Some of Defendants' campaigns had up to almost one hundred different varieties of fraudulent swipes for Defendants and their sub-affiliates to use.

69.     Even though Defendants and/or sub-affiliates sent the swipes to prospective customers, those emails often appeared as though the fictional character(s) depicted in the

VSL for the campaign sent the communications.  Defendants made it appear as though emails to prospective customers came from the owner or support department of the advertised System so the solicitation looked more persuasive and credible.

70.     For example, on or about February 23, 2016, an email was sent out purportedly on behalf of "PMA company."  That email–signed by the fake founders of the fake PMA company–was replete with the following false statements:

> We have just closed a special deal with one of our major brokers.  Everyone that registers their PMA App today gets a matching deposit bonus . . . up to $10k if you're so fortunate . . . Just in the past 24 hrs the PM App has made the new members a combined $118,927.36.  Just in the last 24hrs!  My friend, you are missing out on serious money if you haven't activated your app yet.  I know last year you were scammed with Binary Options bots.  Trust me, this is not one of those scams.  Not even close.  PMA Company received the Most Profitable Trading System award at the NY convention of 2015.  Yes we are a real legit company that really wants to help you become filthy rich.

In fact, Defendants sent out that email, the trading results of purported users in the email were fake, there were no "beta testers" or 2015 convention, and there was never a company called PMA Company.  The email included no disclosures about hypothetical or simulated trading results.

71.     In May 2016, Defendants, through the same fictitious PMA founders, sent various emails to a disabled veteran living on disability payments, reminding the recipient to fund a trading account "to make possibly 7 figures in 180 days just like our first group of beta testers!"  One email stressed the "limited availability" of PMA and urged that customer to fund his account "so you'll be able to start making money right away."  These emails

included fake trading profits, false time limits, and no disclosures about hypothetical or simulated trading results.

72.     Defendants' solicitation emails included testimonials, but the emails did not disclose that the testimonial was no guarantee of future performance or success as required by Regulation 4.41(a)(3).

73.     Defendants' solicitation emails included simulated and/or hypothetical performance results but the emails did not disclose the fact that those results were simulated and/or hypothetical in immediate proximity to those statements as required by Regulation 4.41(b)(2).

74.     Defendants, directly and/or indirectly, sent tens of millions of binary options solicitations during the relevant period.

**D.     Defendants' Websites Featured Elaborate Sales Videos Designed to Deceive Prospective Customers to Open and Fund Binary Options Accounts**

75.     All of Defendants' campaign websites featured at least one VSL that depicted a fictional story about a Trading System portrayed by paid actors representing fictional characters making false or misleading statements about the Trading System's trading results, risk of loss, and profits earned.  Defendants intentionally or recklessly disseminated each of these fictional VSLs with the false or misleading statements.

76.     Defendants' websites included simulated and/or hypothetical performance results but, to the extent any disclosure was present on the websites at all, the websites did not prominently disclose the fact that those results were simulated and/or hypothetical in immediate proximity to those statements as required by 17 C.F.R. § 4.41(b)(2).

77.     Defendants created at least seventeen (17) fraudulent VSLs on their own and launched VSLs Partner and/or others created on other occasions.  Atkinson was proud of his fraudulent VSLs–he often bragged about the quality and realistic nature of the VSLs that he calls "movies."  Defendants intentionally or recklessly included materially false or misleading statements in the VSLs streamed on their campaign websites.

78.     Atkinson either wrote the script for Defendants' VSLs or he retained a copywriter, Copywriter A, to do so.  For each campaign, Atkinson or Copywriter A created a fictional story about the advertised System and reported made-up results and success stories purportedly from use of that System.  Atkinson has never traded binary options and does not know of any real customers' experience(s) that could serve as the basis for events portrayed in Defendants' scripts and corresponding VSLs.

79.     When he did not write the script himself, Atkinson generally provided an idea for the story and directed Copywriter A to make it up and make it sound good.  Atkinson reviewed Copywriter A's scripts, often made edits, and approved the final version before sending final payment from AIP's account.  During the Relevant Period, paid Copywriter A at least $85,000.

80.     Consequently, the VSLs written by Atkinson and Copywriter A were replete with false or misleading statements.  Atkinson even bragged to other affiliate marketers, copywriters and Video Producer A about his skill at drafting convincing fictitious copy and about using Copywriter A, the "best copy writer money can buy (think movie scripts/infomercial status)."

81.     Defendants were assisted by Video Producer A and his media company, who created VSLs from Defendants' scripts.  Defendants had substantial input into the VSLs created by Video Producer A, including by providing him with images of bank and trading account statements, selecting the setting or location for the shoot, and choosing the actors who would bring the script to life on screen.  Atkinson reviewed and often made comments or proposed edits to the VSL before approving and paying for the VSL and knew that Video Producer A's VSLs contained false or misleading information

82.     Defendants reviewed the final version of each AIP binary options VSL before publishing it on their campaign websites.

83.     Defendants' VSLs included purported trading profits, actors portrayed as the founders of the marketed Trading System with vast experience in trading, and other misrepresentations designed to assure the viewer that the information relayed was real even though everything was fake.  When publishing the VSLs, Defendants knew that the VSLs did not reflect real people's results from use of the marketed Trading System.

84.     On at least two occasions, Partner provided Defendants with binary options VSLs that included materially false and misleading statements.  In launching marketing campaigns, Defendants in turn intentionally or recklessly used those VSLs which included those same materially false or misleading statements.

85.     Defendants also earned commissions promoting at least nine additional binary options VSLs procured by other affiliates, including Partner, which included materially false or misleading statements.  Defendants subsequently intentionally or recklessly disseminated

those VSLs knowing or recklessly disregarding that they included materially false or misleading statements.

86.     Defendants designed the VSLs they published on the internet to be deceptive or misleading.  Atkinson even mocked United States recipients of his fraudulent solicitations as "stupid" and bragged, "I guess that's why I love living here easy scammin [(*sic*)] [.]"

          i.   <u>Deceptive Props & Characters</u>

87.     Defendants' wanted the VSLs to make it appear as though the advertised System resulted in wealth and to create an overall "life of the rich and famous" image.  The lavish props depicted in Defendants' VSLs were designed to mislead viewers into believing that success with the advertised System enabled the characters to live such lifestyles.

88.     Defendants' VSLs included props like luxury vehicles, a private jet, and mansions–all rented to create the video and not in fact owned or purchased by any user of the advertised System.  Atkinson or Copywriter A either specified the type of lavish props to use and/or approved all props included in the VSLs Video Producer A created for Defendants.

89.     None of Defendants' binary options VSLs involved real users or creators of the advertised System.   As scripted, the actors brazenly lied in the videos about their role and the fictional story line.  For example, the SMS VSL included the following false statements delivered by an actor:

-  "See anyone can throw numbers around and whip up some proof shots.  All the scammers do it.  This isn't that.  This is a completely different playing field.  And you're going to see real proof . . . you can't deny . . . and . . . in a way you've never seen before in your life."

- "Everything I'm about to tell you is 100% real and was experienced by me firsthand."

All of those statements were fabricated by and/or on behalf of Defendants.

90.     Similarly, in the PMA VSL that Video Producer A created, one fictional scene includes a purported "founder" of PMA who received a telephone call "live" from a "new subscriber named Tommy Radcliffe" who says he "just signed up" and already made $345. The "founder" responds: "Okay, well, that is definitely 100% accurate and real.  That is your money my friend and it's only going to compound from there as long as you keep the software in the ON position."  Contrary to the representations in the video, everything in that scene was fictitious.

91.     Atkinson understood that the more realistic and sympathetic the characters, the more likely viewers would respond favorably.  He told other Affiliates: "I did one where the kid was dying of cancer . . . and dad was given the system so he could make money to save his kids [(*sic*)] life.  It converted great.  But get this [an affiliate network] banned it! LOL!"

92.     Defendants intentionally or recklessly disseminated VSLs with props and characters that were fake, unrelated to actual users of or results derived from the advertised Trading System, and likely to mislead prospective customers.

    ii.   False "Live Trading Results"

93.     Defendants' VSLs that depicted historical and/or live trading results were fake.

94.     Defendants knew that going the extra mile with "crazy social proof" resulted in more conversions because the fraudulent solicitation looked more credible and persuasive. Atkinson advised other Affiliates: "whats big show the software making trades and making

money . . . also send these stupid f*ckin buyers a sick video follow up I do this on IM shit too now it crushes."

95.     For example, the VSL for CC portrays "Robert Allen" as the star.  Allen, a doctor, apparently received the CC System from a "true billionaire" and "financial mogul" on his deathbed after Allen cared for him in the hospital.  The VSL shows screenshots of Allen's trading account from July 2009 through August 2009 and also a "live" video of the account with big red letters across the screen, "LIVE ONLINE PROOF."  Allen explains that he "just" deposited $250 "risk-free" into his account and he will "show you the money it makes LIVE over the next 60 seconds.  We can back up every word we say with real life results."  The VSL shows the account increasing nine times then settling at $356,910 in the span of one minute.  However, Robert Allen was a fictional character portrayed by an actor, there was no billionaire mogul creator, and Allen had no trading account from 2009 or any trading profits from the CC System.  Indeed, Video Producer A fabricated the trading result "proof" displayed in the video at Atkinson's request.

96.     Likewise, in the Fast Cash VSL, "Madison Clark" and "David Graham" claim that the FC System made them over $55 million in three years.  The video shows various bank account statements with millions of dollars and "Clark's" account at fastcash.biz with over $3.5 million.  "Clark" then purports to log in live "so you know this is 100% real and cannot be faked."  The binary options trading account screenshot shows a balance over $9.3 million and various foreign exchange transactions she had supposedly executed and profited from.  Clark, Graham, the account screenshots, and depicted results were fabricated.

Defendants either supplied Video Producer A with that fake proof or Video Producer A fabricated it at Atkinson's request.

                  iii.   <u>False Proof & Testimonials</u>

97.    Defendants' VSLs included fake "testimonials" of purported users of the advertised System.  For Defendants' VSLs, Atkinson wrote and/or directed Copywriter A to draft testimonials based on fictional characters' pretend experiences and false results.  AIP Defendants intentionally or recklessly disseminated the false testimonials as part of their marketing campaigns..

98.    The testimonials included in Partner's videos were also fiction. Defendants also intentionally or recklessly disseminated these false testimonials as part of their marketing campaigns

99.    The testimonials often stressed that users had achieved success quickly, but all of those statements were made up.

100.    For example, in the same VSL, "Alexandra," who purportedly had just opened a binary options trading account, made $202 in sixty seconds.

101.    In the FMS VSL, two individuals said they became millionaires in three months, and screenshots of false bank and PayPal accounts accompanied their testimonials.

102.    In the FC VSL, "Gordon Powers," a 61 year old army veteran suffering from osteoporosis claimed that he deposited $250 in his trading account and "Ten minutes in just like they promised, I had over eleven thousand dollars in my brokerage account."

103.    In the PMA VSL, Video Producer A fabricated all bank account, trading account, and checks reflected in the VSL, including the fake company's checks (signed by the fake founder) displayed as proof to support the false testimonials, at Defendants' request.

104.    Defendants intentionally or recklessly included materially false or misleading statements in all the VSL testimonials that they disseminated or made available to prospective customers as Affiliates or sub-affiliates.  Atkinson knew that his false testimonials worked and bragged about re-using some with customers that had previously taken the bait: "I'm trying to scam the BCC leads [from the BCC campaign] with 18 fake testimonials from BCC[.]"

105.    The testimonials in Defendants' binary options VSLs also failed to prominently disclose that they may not represent the experience of other users of the advertised System, that the testimonial was not a guarantee of future performance or that the testimonial was entirely fake and represented by paid actors or misappropriated images from the internet.

iv.   False Guarantees of Profits

106.    Defendants' binary option campaigns not only included false profits, but they also purported to guarantee those profits:

- In CC, the viewer is told:  "And our success rate? It's pretty clear.  It's 100% accuracy.  All of our clients are financially independent within 60 days of using this system . . .  on average."  The VSL concludes with: "As I always say . . . a system either works or it doesn't.  And if it works . . . it works every time.  And this one works.  Period."

- The AMA campaign promised:

      o  "In sum total . . . we know . . . you will be earning at least $300,000 per month–also known as . . . $3.6 million dollars per year . . . starting just 30 days from now . . . just as sure as 1 plus 1 equals 2.  Gosh, I love numbers! These are mathematical certainties . . . ."

      o  "The Auto Money App only picks winning trades . . . These brokers only work for the Auto Money App and they are designed to make sure your initial deposit turns you into a millionaire in 90 days or less."

- FMS promised, "I'm going to make you a millionaire in 3 months tops[.]"

- SMS includes: "And when you do get to the end of this video, you will also be rewarded with a guaranteed $1000 in your first 60 seconds and $10,000 in your first two days for free . . . There will be no losses.  None at all."

107.    Defendants' VSLs also generally described use of the System as "risk-free."

108.    The VSLs that Defendants used in their campaigns did not disclose any risks of trading binary options in commodity futures, swaps, and/or foreign exchange.

     v.  <u>Falsely Describing Trading Systems as Automated Trading</u>

109.    Defendants' binary options campaigns further touted how easy it was for a customer to make money with the system "automatically."  For example, AMA's solicitation claimed: "My system trades binary options for you on complete autopilot.  You only have to push one button to make money and you actually earn money in 60 seconds."

110.    FC and other VSLs make similar claims: "We make hundreds of dollars and even thousands of dollars every 60 seconds on autopilot with the Fast Cash Biz."

111.    In GG, the System "creator" focuses on the ease of earning profits automatically:

- "I put $200 in here to start, I fired up the software and took my wife out for breakfast. When I got home and checked the account and there was already $390 in it."

- "A profit of $4550 streamed into my account [since the day before] while I spent the day playing with my wife."

112.    However, the Trading Systems which Partner supplied for Defendants' binary options campaigns were not programmed to auto-trade accounts on behalf of customers but rather to provide trading signals from which users could make trading decisions themselves.

      vi.   <u>False Urgency</u>

113.    Other common false or misleading statements in Defendants' binary options campaigns involve the limited availability of the marketed Trading System, or some restriction on the amount of time left to take advantage of the opportunity.  These lies appear in VSLs, on Defendants' binary options websites and in email solicitations to prospective customers.

114.    For example, in the CC VSL, the actor falsely claims that the link to the VSL is only sent to a limited number of individuals, they accept 10 people a day, and the recipient must act quickly because the "button" to register is only available for ten minutes.

115.    The VSL on the members' page for FMS reiterates the urgency for prospective customers to take action:

> you have exactly 10 minutes to complete your registration process.  Your chance to make millions will expire if you don't take action right now . . . . To date, I've had 152 members get free access to my system and combined they have made over $148 million dollars . . . you'll be a millionaire before you know it, but only if you act right now.

116.    In fact, Defendants widely disseminated their binary options campaigns to millions of email addresses.  Also, Defendants' binary options campaigns often generated

revenues for Defendants and/or their sub-affiliates for months after Defendants launched the funnel.

### E.       Defendants Tried to Cover Their Tracks

117.    In or about October or November 2016, Defendants removed and/or disabled access to AIP's binary options campaign websites.

118.    In or about October or November 2016, Defendants deleted and/or otherwise destroyed VSLs, emails, websites, and/or other documents and communications related to binary options, including Skype communications and materials related to Facebook.

119.    Defendants deleted, destroyed, and/or disabled access to documents and communications involving binary options after Defendants received a subpoena requesting those materials from a federal agency.

### F.     Defendants Successfully Scammed Tens of Thousands of Individuals

120.    Between October 2013 and June 2016, AIP's account received over twenty-seven million dollars ($27,000,000) resulting from Defendants' affiliate marketing activities, including, and primarily, fraudulent binary options solicitations.  Of those earnings, Defendants received the majority from accounts that Partner controlled, but also got payments from Brokers, Broker intermediaries, payment processors, and affiliate networks, among others.  A portion of Defendants' earnings stemmed from their role as sub-affiliates for other fraudulent binary options campaigns.

121.    Between October 2013 and October 2016, AIP deposited over one million and eight hundred thousand dollars ($1,800,000) into a Gasher bank account.

122.    Between January 2014 and June 2016, at least 51,000 new customers opened and funded binary options trading accounts in connection with fraudulent campaigns involving Defendants and Partner.

123.    The amount of money customers deposited when opening a new account varied.  Generally, customers were required to deposit at least $250 initially.  For campaigns that Defendants worked with Partner, the 51,000 customers that opened new accounts between January 2014 and June 2016 thus deposited at least $12,750,000 in trading accounts after making it through Defendants' deceptive binary options funnels.

124.    The amount of total customer deposits was much higher as Brokers continued to solicit customers to deposit additional funds, often relying on Defendants' marketing materials to do so.  For example, one Broker told Partner that for one month he owed Defendants $8,040 in commission payments based on 804 new customers resulting from Defendants' campaigns.  Those customers apparently deposited $931,902 for that month alone.  The 804 new customer accounts represented only a fraction of the 12,554 individuals who went through Defendants' funnel all the way to open and fund a new account.

125.    Tens of millions of individuals received Defendants' fraudulent solicitations. For example, in less than 3 weeks, the PMA website had over 2 million visitors and the campaign generated commissions for Defendants for almost nine months.

F.    **There Is Evidence that the Illegal Marketing Campaigns Are Ongoing**

126.    Upon information and belief, Passerino and Gasher continued working with Partner in connection with fraudulent solicitations related to binary options, forex, and/or CFD campaigns until at least April 2018.  Bank records reveal that Passerino has received

over one million ($1,000,000) from Partner or accounts controlled by Partner's between

November 2016 and April 2018.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.4, 17 C.F.R. § 32.4 (2018)**
**Defendants' Options Fraud**

127.   The allegations in the foregoing paragraphs are incorporated by reference as if fully set forth herein.

128.   7 U.S.C. § 6c(b) makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

129.   17 C.F.R. § 32.4 provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly: (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

130.   Defendants intentionally or recklessly used fraudulent solicitations in emails, websites, and fictitious VSLs promising free access to Trading Systems to induce prospective

customers to open and fund a binary options trading account with a recommended Broker so that Defendants could earn commissions.

131.     During the Relevant Period, Defendants, by the conduct alleged in the foregoing paragraphs, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction directly or indirectly: (a) cheated or defrauded, and attempted to cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

132.     The foregoing acts, misrepresentations and omissions of Atkinson and Passerino occurred within the scope of their employment, office or agency with AIP. Therefore, AIP is liable for their acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

133.     The foregoing acts, misrepresentations and omissions of Passerino occurred within the scope of his employment, office or agency with Gasher.  Therefore, Gasher is liable for his acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

134.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## COUNT TWO

**Violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1)(2012):
Defendants' Fraud as a CTA**

135.     The allegations in the foregoing paragraphs are incorporated by reference as if fully set forth herein.

136.   During the Relevant Period, Defendants acted as CTAs by disseminating for compensation numerous and varied marketing materials which advised customers and prospective customers to open binary options accounts and use purportedly successful trading systems to trade those accounts.

137.   7 U.S.C. § 6*o*(1) makes it unlawful for a CTA, using the instrumentalities of interstate commerce, directly or indirectly:

> (A)     Employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B)     To engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

138.   Defendants fraudulently solicited members of the public and created and/or disseminated fraudulent websites and emails to induce members of the public to go through their funnel to open and fund new binary options trading accounts with a recommended Broker to access the advertised trading System.  For each of Defendants' binary options campaigns, including but not limited to the twenty (20) Defendants launched and at least nine (9) others they disseminated, Defendants repeatedly misrepresented, among other things: (i) hypothetical and fictitious trading results as real results; (ii) actors as true users of the Trading Systems; (iii) the fictitious experience, background and skill of the "creators" of the Trading Systems; (iv) fabricated testimonials; and/or (v) that the Trading Systems traded automatically.

139.   During the Relevant Period, Defendants, by the conduct alleged in the foregoing paragraphs, while acting as CTAs, used the instrumentalities of interstate commerce and: (a) employed numerous devices, schemes, or artifices to defraud clients and

prospective clients; and (b) engaged in transactions, practices, and courses of business which

operated as a fraud or deceit upon clients and prospective clients, in violation of 7 U.S.C.

§ 6*o*(1).

140.    The foregoing acts, misrepresentations and omissions of Atkinson and

Passerino occurred within the scope of their employment, office or agency with AIP.

Therefore, AIP is liable for their acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

141.    The foregoing acts, misrepresentations and omissions of Passerino occurred

within the scope of his employment, office or agency with Gasher.  Therefore, Gasher is

liable for his acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

142.    Each defendant is liable for the acts, omissions, or failures of agents,

employees, or persons otherwise acting for that defendant, pursuant to 7 U.S.C. § 2(a)(1)(B)

and 17 C.F.R. § 1.2.

<u>**COUNT THREE**</u>

**Violation of Regulation 4.41(a)(1)-(3), (b)(1)-(2), 17 C.F.R. § 4.41(a)(1)-(3), (b)(1)-(2) (2018):**
**Defendants' Fraudulent Advertising**

143.    The allegations in the foregoing paragraphs are incorporated by reference as if

fully set forth herein.

144.    17 C.F.R. § 4.41(a)(1)-(2) prohibit fraudulent advertising by a CTA.

145.    17 C.F.R. § 4.41(a)(3) makes it unlawful for any CTA to refer to any

testimonial, unless the advertisement or sales literature providing the testimonial prominently

discloses, in pertinent part: (i) that the testimonial may not be representative of the

experience of other clients; (ii) that the testimonial is no guarantee of future performance or success; and (iii) If, more than a nominal sum is paid, the fact that it is a paid testimonial.

146.    17 C.F.R. § 4.41(b) makes it unlawful for any CTA to present simulated or hypothetical performance commodity interest account or transaction or series of transactions unless the statement below is prominently disclosed "in immediate proximity to the simulated or hypothetical performance being presented":

> These results are based on simulated or hypothetical performance results that have certain inherent limitations. Unlike the results shown in an actual performance record, these results do not represent actual trading.  Also, because these trades have not actually been executed, these results may have under-or-over-compensated for the impact, if any, of certain market factors, such as lack of liquidity.  Simulated or hypothetical trading programs in general are also subject to the fact that they are designed with the benefit of hindsight.  No representation is being made that any account will or is likely to achieve profits or losses similar to these being shown.

147.    During the Relevant Period, Defendants each acted as a CTA.

148.    Each of the binary options advertising campaigns that Defendants launched and/or disseminated, including the twenty-nine (29) identified herein were rife with materially false or misleading statements.

149.    Defendants' promotional materials, including emails, websites and VSLs, refer to testimonials in their binary options campaigns.  Defendants did not, however, prominently disclose for each testimonial that it may not represent the experience of other users of the advertised System, that the testimonial was not a guarantee of future performance or that the testimonial was entirely fake and represented by paid actors or misappropriated images from the internet.

150.     Defendants' promotional materials, including emails, websites and VSLs, further depicted fabricated performance results of binary options transactions in, among other instruments, commodity futures, options, swaps and forex, without displaying the required disclosure in immediate proximity to those statements.  To the contrary, the VSLs repeatedly referred to trading performance, activity and results as "real" and depicted "live."

151.     By the conduct alleged in the foregoing paragraphs, Defendants advertised in a manner that was fraudulent and failed to include the required disclosures for hypothetical or simulated trading performance and testimonials in violation of 17 C.F.R. § 4.41(a)(1)-(3) and (b)(1)-(2).

152.     The foregoing acts, misrepresentations and omissions of Atkinson and Passerino occurred within the scope of their employment, office or agency with AIP. Therefore, AIP is liable for their acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

153.     The foregoing acts, misrepresentations and omissions of Passerino occurred within the scope of his employment, office or agency with Gasher.  Therefore, Gasher is liable for his acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

154.     Each defendant is liable for the acts, omissions, or failures of agents, employees, or persons otherwise acting for that defendant, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## COUNT FOUR

**Section 6(c)(1) of the Act,7 U.S.C. § 9(1) (2012) and Regulation 180.1(a)(1)-(3),
17 C.F.R. § 180.1(a)(1)-(3) (2018)
Defendants' Manipulative & Deceptive Device, Scheme or Artifice**

155.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

156.    Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A) (2012), defines "swap" to include, among other things, any agreement, contract, or transaction that: (a) is an option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or properly of any kind, without also conveying an ownership interest in any asset or liability.

157.    7 U.S.C. § 9(1) provides in relevant part, "[i]t shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the as the Commission shall promulgate…."

158.    17 C.F.R. § 180.1(a)(1)-(3) provides in relevant part, that it shall be unlawful for any person, in directly or indirectly:

> In connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the

rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of materials fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person …

159.   Defendants' campaigns advertised free access to Trading Systems trading swaps, as defined by the Act.

160.   Defendants intentionally or recklessly used fraudulent solicitations in emails, websites, and fictitious VSLs promising free access to their Trading Systems to induce prospective customers to go through their funnel and open and fund a binary options trading account with their recommended Broker to earn commissions.

161.   Defendants relied on Partner to serve as a liaison with Broker and follow up on Defendants' leads to increase the number of conversions and their corresponding commissions.  Defendants also relied on Copywriter A and Video Producer A to help Defendants carry out their fraudulent solicitation scheme.

162.   Defendants further intentionally or recklessly disseminated fraudulent solicitations on behalf of other Affiliates and earned commissions as a result of their activities.  .

163.   During the Relevant Period, Defendants, by the conduct alleged in the foregoing paragraphs, directly and indirectly, in connection with swaps intentionally or recklessly,: (a) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b) made, or attempted to make, untrue or misleading statement of a material fact; (c) omitted to state material facts necessary in order to make

statements made not untrue or misleading; and (d) engaged, or attempted to engage, in acts,

practices, and courses of business, which operated or would operate as a fraud or deceit upon

customers and prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R.

§ 180.1(a)(1)-(3).

164.    The foregoing acts, misrepresentations and omissions of Atkinson and

Passerino occurred within the scope of their employment, office or agency with AIP.

Therefore, AIP is liable for their acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C.

§ 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

165.    The foregoing acts, misrepresentations and omissions of Passerino occurred

within the scope of his employment, office or agency with Gasher.  Therefore, Gasher is

liable for Passerino's acts pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

166.    Each defendant is liable for the acts, omissions, or failures of agents,

employees, or persons otherwise acting for that defendant, pursuant to 7 U.S.C. § 2(a)(1)(B)

and 17 C.F.R. § 1.2.

## VII.    RELIEF REQUESTED

167.    WHEREFORE, the Commission respectfully requests that this Court, as

authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to the Court's

own equitable powers:

a.      Find that Defendants violated Sections 4c(b), 4*o*(1), and 6(c)(1) of the Act,

7 U.S.C. §§ 6c(b), 6*o*(1), 9(1) (2012), and Regulations 4.41(a)(1)-(3) and

(b)(1)-(2), 32.4, and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.41(a)(1)-(3), (b)(1)-(2),

32.4, 180.1(a)(1)-(3) (2018).

b.      Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6c(b), 6*o*(1), and 9(1), and 17 C.F.R. §§ 4.41(a)(1)-(3) and (b)(1)-(2), 32.4, and 180.1(a)(1)-(3).

c.      Enter an order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from directly or indirectly:

    i.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   ii.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)) for Defendants' own personal accounts or for any accounts in which Defendants have a direct or indirect interest;

  iii.      Having any commodity interests, traded on Defendants' behalf;

  iv.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

   v.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vi.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

vii.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

d.      Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and the Regulations, including pre- and post-judgment interest;

e.      Enter an order directing Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as

described herein, and pre- and post-judgment interest thereon from the date of such violations;

f.      Enter an order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act, as described herein;

g.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

h.      Enter an Order providing such other and further relief as this Court may deem necessary and appropriate.

44

Dated: September 27, 2018

Respectfully submitted,

/s/ Allison V. Passman

Allison V. Passman, trial counsel
Special Bar ID #A5502489
Susan Gradman, trial counsel
Special Bar ID #A5501721

Rosemary Hollinger
Scott R. Williamson

Attorneys for Plaintiff
Commodity Futures Trading
 Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
apassman@cftc.gov
sgradman@cftc.gov
rhollinger@cftc.gov
swilliamson@cftc.gov